Anne E. Findling, Esq. (010871)
Lauren E. Channell, Esq. (033484)
**ROBBINS & CURTIN, p.l.l.c.**
301 East Bethany Home Road, #B-100
Phoenix, Arizona 85012
Tel: 602-285-0100
Fax: 602-265-0267
anne@robbinsandcurtin.com
lauren@robbinsandcurtin.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kysha Slocumb, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Jason McClelland, an individual, on his own behalf and on behalf of his marital community; and Jeffrey Van Winkle, an individual, on his own behalf and on behalf of his marital community,<br><br>Defendants. | No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Kysha Slocumb complains against Defendants and alleges as follows:

**PARTIES**

1. Kysha Slocumb (hereinafter "Plaintiff") is a female resident of the State of Arizona.

2. Plaintiff, at all times alleged herein, was a correctional officer employed by the Arizona Department of Corrections ("ADOC").

3. Defendant Jason McClelland, at all times alleged herein, was a correctional sergeant employed by ADOC and was acting within the course and scope of his employment and under the color of state law. He is, and was, a "state actor" as that term is used under the jurisprudence of 42 U.S.C. § 1983.

4. Defendant Jeffrey Van Winkle, at all times alleged herein, was employed by the State of Arizona as the Warden for Arizona State Prison Complex ("ASPC") – Florence Central Unit and was acting within the course and scope of his employment and under the color of state law. He is, and was, a "state actor" as that term is used under the jurisprudence of 42 U.S.C. § 1983 and was a final policymaker responsible for making and enforcing official policies at ASPC – Florence Central Unit.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

7. All conditions precedent to the institution of this suit have been fulfilled and Plaintiff has satisfied all jurisdictional prerequisites to the maintenance of this action.

## DEMAND FOR JURY TRIAL

8. Plaintiff demands a jury trial as to all triable issues.

## GENERAL ALLEGATIONS

**Defendant McClelland had a longstanding history of sexually harassing his female coworkers and subordinates, which was common knowledge among command staff and supervisors at ASPC – Florence Central Unit.**

9. Defendant Jason McClelland was hired by ADOC as a correctional officer in approximately 2014 and worked primarily at the ASPC – Florence Central Unit in Florence, Arizona.

10. ADOC promulgates Departmental Orders (D.O.) that govern the conduct of employees of the Department.

11. ADOC promulgated D.O. 501, Employee Professionalism, Ethics and Conduct that imposes an affirmative responsibility on all employees to "immediately report misconduct to their chain of command."

12. Department Order 501 also imposes an affirmative responsibility on all employees to report "[c]riminal activity involving employees as suspects or victim" to local law enforcement having jurisdiction.

13. ADOC promulgated D.O. 523, Domestic and Workplace Violence that imposes an affirmative responsibility on all employees who witnesses "the threat or assault of another employee, while at work" to report to his/her supervisor and to write an informational report.

14. On information and belief, Defendant McClelland began making inappropriate sexual advances toward his female coworkers, including correctional officers as well as medical staff who worked for the prison's healthcare contractor, shortly after he began his employment with ADOC.

15. On information and belief, other employees of ADOC either witnessed, were informed, or otherwise became aware of the acts of Defendant McClelland, triggering an affirmative duty to report the conduct.

16. In approximately August 2014, Defendant McClelland made inappropriate sexual advances toward a female correctional officer, S.G., telling her he was going to kiss her.

17. Defendant McClelland cornered S.G. while she was posted in a secluded area and stated, "I'm here for my kiss."

18. Despite S.G.'s attempts to rebuff Defendant McClelland, he kept coming closer and insisting on kissing her, but another correctional officer entered the area and interrupted Defendant McClelland before he made contact with S.G.

19. On information and belief, ADOC did not reprimand Defendant McClelland or take any action against him following this incident.

20. Defendant McClelland was eventually promoted to the rank of sergeant and became a corrections supervisor.

21. Defendant McClelland also became a member of the Tactical Support Unit (TSU) which is an elite group of correctional officers, at times thought of as a "S.W.A.T.

team" for prisons. This specialized unit is called out to respond to crises, and its members are specially trained and generally held in high regard by their co-workers and prison staff.

22. On information and belief, Defendant Warden Van Winkle was particularly close to the TSU members, including Defendant McClelland, and is believed to have known of McClelland's disposition and inappropriate conduct toward women in the workplace.

23. ADOC provided the TSU members with access to restricted areas within the prison worksite, including a designated "TSU Building," also known as "the Dorm," and an adjacent structure known as the "Commander's Room."

24. As a sergeant and member of the TSU, Defendant McClelland was given access to the TSU areas, including the TSU Building and the Commander's Room.

25. Defendant McClelland sexually assaulted at least three of his victims, including Plaintiff, in the TSU Building or Commander's Room.

26. On information and belief, it was well known among prison staff, including other sergeants and supervisory personnel, that Defendant McClelland was overly flirtatious and inappropriate in the workplace and that he had sexual relationships with several staff members over the years.

27. It was also well known among staff that Defendant McClelland would prey on young female staff members who he perceived to be vulnerable and easy to coerce and that he would not accept "no" for an answer.

28. On information and belief, several female corrections and medical staff members resigned or sought transfers to other prisons after being victimized by Defendant McClelland in the workplace.

29. However, Defendant McClelland was popular, well liked, and respected among the command staff at ASPC – Florence Central Unit, and the "boys will be boys" culture that existed within the prison allowed his sexual proclivities to go unchecked.

30. On information and belief, Defendant McClelland would use his authority and his position as a sergeant and supervisor to ensure he knew where and when his victims would be working and would ensure that he was assigned to work near them.

31. On information and belief, Defendant McClelland would determine whether his victims would be working alone or stationed in secluded areas of the prison, and he would seize the opportunity to corner them when no one else was around.

32. Defendant McClelland also used ADOC's computer system to obtain his victims' personal phone numbers, which he would use to call and text them without their consent.

33. In approximately January and September 2019, Defendant McClelland sexually assaulted a female corrections officer, Brittney Fountain,[1] at ASPC – Florence Central Unit. The September 2019 assault occurred in the TSU Building.

34. Shortly after the assaults, Defendant McClelland spread rumors about Ms. Fountain around the prison complex, suggesting that she had willingly "hooked up" with him and was sexually promiscuous, presumably in an attempt to discredit her and protect himself against any allegations or investigations into his behavior.

35. As a result of Defendant McClelland's rumors about Ms. Fountain, other male staff members relentlessly verbally harassed her for months, and supervisors were aware of the harassment.

36. On one occasion, another sergeant, Sergeant Mallaire, offered Ms. Fountain money in exchange for a date, rather than correcting or reporting the harassment.

37. Ms. Fountain did not immediately report the sexual assaults and harassment because of her concern for retaliation and the prison's culture toward female corrections officers. Because of the rumors and sexual harassment, her reputation was damaged, and she was not considered part of the "team" by many of her peers. Ms. Fountain did not feel safe or confident in her team or staff because of the favoritism shown to Defendant McClelland, the "good ol' boys" culture at the prison, and the continuous character assassination and sexual harassment to which she was subjected.

---

[1] Ms. Fountain currently has a lawsuit pending in this district court against Defendants and the State of Arizona (*Fountain v. State*, et al., 2:21-cv-00356-JJT).

38. On information and belief, female victims of harassment at ASPC – Florence were discouraged from formally reporting abuse and harassment and believed reporting would be futile and would likely result in retaliation because of ADOC's "informal resolution" policy.

39. The "informal resolution" policy allowed supervisors to dispose of paperwork or complaints, known as "Information Report" or "IRs," written about them or alter the documents to benefit themselves. When a situation such as harassment was reported, the "informal resolution" process allowed supervisors to manipulate the outcome to their liking and consider the matter resolved while not documenting (or inaccurately documenting) the matter to claim probable deniability later.

**Defendant McClelland used his rank and authority to sexually harass and assault Plaintiff in the workplace.**

40. In late December 2019 and January 2020, Defendant McClelland began to make sexual advances toward Plaintiff in the workplace. His advances made Plaintiff uncomfortable, but she was intimidated and fearful because of his rank and authority over her.

41. Defendant McClelland, as a sergeant, had supervisory authority over Plaintiff.

42. Defendant McClelland would call Plaintiff repeatedly during shifts they worked together, and he appeared to have the ability to control where Plaintiff worked so he could be near her.

43. On one occasion, Defendant McClelland asked Plaintiff to escort him to the parking lot. Once they reached the parking lot, he told her he loved her, grabbed her stab vest, and tried to forcibly kiss her.

44. Plaintiff pulled away, held her hand out to stop him, and explained that she needed to go.

45. Defendant McClelland began to pursue Plaintiff even more forcefully. He falsely told other staff members that he and Plaintiff were in a consensual relationship, presumably to discredit her if she attempted to report his misconduct.

46. Defendant McClelland obtained Plaintiff's personal phone number, presumably through ADOC's computer systems and began calling and texting her frequently without her permission. He wrote her a letter stating he loved her and followed her to a gas station after working overtime shifts.

47. Plaintiff was concerned that Defendant McClelland could ruin her career because he was a sergeant and was well-liked and respected among prison employees and command staff.

48. In early February 2020, Defendant McClelland asked Plaintiff to go into the COIII office at Kasson Unit. He tried to convince her to have sex with him and attempted to unzip her pants.

49. When Plaintiff told Defendant McClelland that she could not have sex with him and tried to get him to stop, he unzipped his pants, exposed himself, and placed her hand on his penis. Defendant McClelland pushed Plaintiff's head down to his penis and forced her to perform oral sex on him.

50. Plaintiff felt trapped, frightened, and that she had no way out of the situation.

51. After this incident, McClelland verbally proclaimed he was going to marry Plaintiff and placed his hand on her shoulder in the presence of another sergeant, Sergeant Rodriguez, and two other corrections officers.

52. On information and belief, Sergeant Rodriguez did not report or correct McClelland's behavior.

53. On a second occasion in February 2020, Defendant McClelland invited Plaintiff to the TSU Building for pizza and insisted on showing her where he slept.

54. Defendant McClelland took Plaintiff to a small room with beds, came up behind her, grabbed her breasts, and placed his hands under her shirt. She pushed his hands away, but he pushed her onto a bed.

55. Defendant McClelland attempted to remove Plaintiff's clothes until another sergeant who had been sleeping in the TSU bay interrupted, and Plaintiff was able to escape.

56. On a third occasion in February 2020, Defendant McClelland again forced Plaintiff to perform oral sex on him in the COIII office.

57. Because of her level of discomfort and fear of Defendant McClelland, Plaintiff requested to go to the Correctional Officer Training Academy (COTA) to try to get away from him.

58. Plaintiff attended COTA in March 2020. When she returned to ASPC – Florence Central Unit, she requested to become a part-time employee, at least in part because she would be assigned to a difference area of the prison away from Defendant McClelland.

59. Plaintiff did not immediately report McClelland's harassment and assaults out of fear of retaliation and concerns about how women were perceived in the workplace, much like McClelland's other known victims.

60. Plaintiff felt that she could not report the incidents to a supervisor or up her chain of command because her lieutenant was on TSU with McClelland and because Warden Van Winkle was "tight with TSU and look[ed] out for them." She believed that if she made a report no action would be taken against McClelland and her life at work would become more difficult.

61. Meanwhile, from approximately February 2019 through April 2020, Defendant McClelland persistently harassed a nurse, M.C., who worked for the prison's health care contractor. He attempted to lure her to the TSU building on more than one occasion, and he struck her buttocks in approximately February 2020.

62. In March 2020, Defendant McClelland verbally sexually harassed M.C. in the presence of another sergeant, Sergeant Pisano, but Sergeant Pisano did not correct or report the harassment.

**After McClelland's investigation and arrest, Plaintiff is harassed by other staff and ultimately requests a transfer to another prison.**

63. On July 15, 2020, Defendant McClelland sexually assaulted a female nurse, Marcella Fox,[2] who worked for the prison's healthcare contractor at ASPC – Florence Central Unit. This attack also occurred in the TSU Building.

64. Ms. Fox reported the assault, and the ADOC Criminal Investigations Unit (CIU) began investigating Defendant McClelland.

65. At that time, other female corrections and medical employees, including Brittney Fountain, S.G., and M.C., came forward to report their experiences of being harassed or assaulted by Defendant McClelland or witnessing his harassment of others.

66. The CIU investigator, Daniel Root, interviewed several victims and witnesses. The female victims and witnesses alike described the same toxic "good ol' boys" culture, the favoritism shown to McClelland, the widespread knowledge of McClelland's behavior among prison staff, and female employees' genuine concern of retaliation for reporting harassment.

67. The CIU investigator also interviewed Sgt. Christian Gurrola de la Torre, who worked with and was "tight friends" with Defendant McClelland. Sgt. Gurrola de la Torre admitted that he had heard "lots of rumors" about McClelland's misconduct and relationships with female staff members, including a specific incident involving a female correctional officer.

68. On information and belief, Sgt. Gurrola de la Torre had not reported any of the alleged "rumors" prior to his interview with the CIU.

---

2 Ms. Fox has a lawsuit pending before this district court against Defendants and the State of Arizona (*Fox v. State*, 2:21-cv-01089-MTL).

69. The CIU investigator also learned that Plaintiff had been victimized by McClelland; however, Plaintiff initially declined to be interviewed because she was experiencing fear, anxiety, and panic attacks related to the assaults.

70. Prison management, including Defendant Van Winkle, did not reprimand or take disciplinary action against McClelland after the allegations came to light.

71. Instead, prison management, including Defendant Van Winkle, allowed Defendant McClelland to continue working at the ASPC – Florence Central Unit without restrictions while the investigation ensued.

72. Defendant McClelland was popular and well liked and he had overwhelming support from other staff members during the investigation, which further contributed to creating an unsafe and hostile work environment for his victims, including Plaintiff.

73. While the CIU investigation against him was underway, Defendant McClelland told Lieutenant Garrett that if "these bitches" ruined his life, he would kill them.

74. On information and belief, neither Lieutenant Garrett nor any other supervisor admonished Defendant McClelland for making the threat or immediately reported and documented the threat. No one informed Defendant McClelland's victims that they had been the subjects of a death threat.

75. ADOC officials, including Defendant Van Winkle, ultimately decided to transfer Defendant McClelland to another complex, ASPC – Eyman, where he was to remain in a supervisory position without restrictions.

76. On August 6, 2020, Defendant McClelland was arrested.

77. On information and belief, at some point near the time of Defendant McClelland's arrest, Defendant Van Winkle and Defendant McClelland had a conversation during which Defendant Van Winkle indicated that he would stand by and support Defendant McClelland.

78. On information and belief, Defendant McClelland communicated the substance of his conversation with Defendant Van Winkle in a phone call from jail that was recorded.

79. Defendant McClelland submitted his voluntary resignation to ADOC on August 11, 2020.

80. On August 12, 2020, Defendant McClelland was indicted on nine charges for the sexual assault, sexual abuse, and kidnapping of Brittney Fountain and Marcella Fox.

81. On August 27, 2020, Plaintiff participated in a formal interview with the CIU investigator.

82. Plaintiff's co-workers knew she was one of Defendant McClelland's victims and that she had participated in the interview with CIU, but because McClelland was so well-liked, her co-workers shunned and ostracized her. Co-workers accused her of being a liar and a "rat," and one co-worker asked her if "she was the rat who got him arrested."

83. Shortly thereafter, Plaintiff requested and was granted a lateral transfer to ASPC – Phoenix.

84. On November 13, 2020, the indictment against Defendant McClelland was amended to add six additional charges for crimes against Plaintiff and M.C.

85. As a result of the assaults, physical and verbal sexual harassment, and the violations of her constitutional right to equal protection, Plaintiff suffered harm to her physical, mental, and emotional wellbeing. She has experienced anxiety, panic attacks, severe emotional distress, humiliation, grief, and fear, and she has incurred medical expenses and other economic losses.

**COUNT ONE**
**42 U.S.C. § 1983 – Violation of Equal Protection**
**(Defendant Jason McClelland)**

86. The foregoing paragraphs are incorporated as if fully set forth herein.

87. Sexual harassment is a form of sex discrimination prohibited by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

88. Defendant McClelland violated Plaintiff's right to equal protection when he sexually harassed beginning in December 2019 and January 2020.

89. Defendant McClelland violated Plaintiff's right to equal protection when he sexually assaulted her on three occasions in February 2020.

90. Defendant McClelland was acting under the color of state law when he sexually harassed and assaulted Plaintiff because his actions were undertaken while exercising his responsibilities as a corrections sergeant, member of the TSU Unit, and Plaintiff's supervisor at ASPC – Florence Central Unit.

91. Defendant McClelland was also acting under the color of state law because he abused the authority and position given to him by the State when he committed the assaults in the workplace at ASPC – Florence, including the TSU Building, which was not accessible to lower ranking employees.

92. As a result of Defendant McClelland's violation of equal protection under the Fourteenth Amendment, Plaintiff suffered physical, mental, and emotional harm. Plaintiff has experienced anxiety, severe emotional distress, humiliation, grief, and fear, and has incurred medical expenses, lost wages, and other economic losses.

93. Because Defendant McClelland's actions were done knowingly, intentionally, and maliciously, Plaintiff is entitled to recover compensatory and punitive damages.

## COUNT TWO
### 42 U.S.C. § 1983 – Violation of Equal Protection
### (Defendant Van Winkle)

94. The foregoing paragraphs are incorporated as if fully set forth herein.

95. At all times alleged herein, Defendant Van Winkle was a final policymaker for ASPC – Florence Central Unit and was Defendant McClelland's supervisor.

96. After Defendant McClelland's victims began to report the sexual harassment and assaults, Defendant Van Winkle had actual knowledge of Defendant McClelland's unconstitutional and criminal conduct toward female prison employees.

97. Defendant Van Winkle purposefully discriminated against Plaintiff by intentionally failing to redress Plaintiff's and other victims' allegations of sexual assault against McClelland.

98. Rather than redress the allegations of sexual assault, Defendant Van Winkle endorsed and supported Defendant McClelland by: (a) allowing Defendant McClelland to remain in his position without restrictions while the CIU investigation occurred, (b) subsequently facilitating McClelland's transfer to a supervisory position at another prison, (c) refusing to reprimand, discipline, or terminate McClelland, (d) telling McClelland that he would stand by him and support him through the matter, and (e) allowing McClelland to voluntarily resign from his position after he had been arrested.

99. Defendant Van Winkle's actions amount to deliberate indifference toward Defendant McClelland's discrimination of Plaintiff and constitute a violation of Plaintiff's right to equal protection under the law.

100. Defendant Van Winkle's deliberate indifference and intentional failure to redress Plaintiff's allegations of sexual harassment and assault caused or contributed to the violation of Plaintiff's right to equal protection under the Fourteenth Amendment, and as a result, Plaintiff suffered physical, mental, and emotional harm, anxiety, severe emotional distress, humiliation, grief, and fear, and has incurred medical expenses and other economic losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A. For special and general compensatory damages, including for past and future medical expenses, lost wages, emotional distress, and loss of enjoyment of life;

B. For punitive damages against Defendant McClelland;

C. For attorneys' fees and costs under 42 U.S.C. § 1988 to the extent permitted by law;

D. For pre- and post-judgment interest to the extent permitted by law;

E. For fees and expenses, including taxable costs, to the extent permitted by law; and,

F. For such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED: November 11, 2021.

        **ROBBINS & CURTIN, p.l.l.c.**

By:   /s/ Anne E. Findling
       Anne E. Findling
       Lauren E. Channell
       301 E. Bethany Home, #B-100
       Phoenix, Arizona 85012
       *Attorneys for Plaintiff*